1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

## EASTERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| NICHOLAS SCOTT STONE, ) | 1:10-cv-01335 LJO-MJS HC |
| Petitioner, ) | FINDINGS AND RECOMMENDATION |
| ) | REGARDING PETITION FOR WRIT OF |
| v.  ) | HABEAS CORPUS |
| ) | |
| R. LOPEZ, Warden, ) | |
| ) | |
| Respondent. ) | |

13
14
15
16
17
18

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

19

pursuant to 28 U.S.C. § 2254.

20

**I.    BACKGROUND**

21

Petitioner is currently in the custody of the California Department of Corrections

22

pursuant to a judgment of the Superior Court of California, County of Kings, following his

23

conviction by jury trial on October 13, 2006, for attempted murder, three counts of assault with

24

a firearm and various enhancements. (Clerk's Tr. at 251-52.) Petitioner was sentenced to a

25

term of 25 years to life, plus three consecutive sentences of seven years to life. (Id.)

26

On March 4, 2008, the California Court of Appeal, Fifth Appellate District (hereinafter

27

"Fifth DCA"), reversed Petitioner's attempted murder conviction and modified the three counts

28

of assault with a firearm to three counts of attempt to dissuade a witness. (Lodged Doc. B.) Petitioner filed a petition for review in the California Supreme Court.  On April 23, 2009, the California Supreme Court reversed the decision of the Fifth DCA and remanded the matter for further adjudication. (Lodged Doc. D, "Stone II.") On October 20, 2009, the Fifth DCA struck the firearm enhancement, made other technical corrections, bu otherwise affirmed the judgment of conviction. (Lodged Doc. E.) Petitioner again sought review from the California Supreme Court, which was summarily denied on January 21, 2010. (Lodged Docs. F-G.)

On July 6, 2010, Petitioner filed the instant federal habeas corpus petition.  Petitioner raised two claims for relief: (1) the variance between attempted murder theory at trial and the theory articulated by the California Supreme Court deprived Petitioner of constitutionally adequate notice, and (2) the conviction of Petitioner using an alternative legal theory set forth by the California Supreme Court would constitute double jeopardy. On April 11, 2011, Respondent filed an answer to the petition.  Petitioner did not file a traverse to the answer.

## II.    STATEMENT OF THE FACTS[1]

At approximately 8:30 p.m. on the evening of October 21, 2005, police officers Mark Pescatore, Jeffrey McCabe, and Sergeant Pat Jerrold were on duty at a parking lot carnival when Officer Pescatore noticed a group of 10 to 25 youths blocking the pathways and moving about the carnival area. About half of those in the group were wearing red, a color associated with Norteno street gangs. It appeared to Officer McCabe that the group was "looking for trouble." Sixteen-year-old Joel F., as well as Gerardo A. and "Jamal" were included in the group. Both Gerardo and Jamal were members of a Norteno street gang.

Sixteen-year-old Camilo M. also was at the carnival, with his friend Abel Rincon. Camilo was a member of a Sureno street gang. Seeing them there, several members of the Norteno gang called Camilo "scrapa," a derogatory term for a Sureno, and challenged Camilo and Rincon to a fight. When Camilo and Rincon decided not to fight and to leave the carnival, a group of Nortenos followed them into the parking lot. Jamal kicked Rincon's truck as Camilo and Rincon drove away.

Camilo and Rincon went back home, contacted several people including Petitioner, and told them what had occurred at the carnival. Camilo and Petitioner were "good friends." About a half-hour to an hour after the original encounter at the carnival, Camilo and Rincon, along with Julio L., Roselynn M., Pedro Gomez, and Petitioner, returned to the carnival in Rincon's truck. Camilo

---

[1]The Fifth District Court of Appeal's summary of the facts in its October 20, 2009 opinion is presumed correct.  28 U.S.C. §§ 2254(e)(1).

and the others armed themselves with "metal pipes," because "[the Nortenos] hit the truck." Rincon drove, while Gomez sat in the center and Petitioner on the passenger side of the front seat. The others sat in the bed of the truck.

Meanwhile, at the carnival, the officers directed the Norteno group to leave, and about 10 of them went to a grassy area in the parking lot. When Rincon and his companions arrived back at the carnival, he drove his truck past the group of Nortenos, and the two groups "mad dogged" each other. Rincon drove past the Nortenos twice and, on the third time, stopped the truck 10 to 15 feet from the group. While Rincon held up three fingers, denoting a gang sign, Petitioner rolled down his window and was "throwing fingers out and he said 13." Petitioner then pulled out a handgun, which he fired "immediately," and the truck left the scene.

Joel F., who was named as the attempted murder victim in count 1, testified for the prosecution at trial. On direct examination, Joel described the position of the gun in Petitioner's hand as "pointed up" "slightly" and extended toward the group when he fired. Joel did not think Petitioner had pointed the gun at anyone in particular, but he acknowledged that when the gun fired, he "ducked behind the car" because he was worried about being shot. The group "scattered" and "[e]veryone kind of ducked." Joel was "more to the back" of the truck at the time of the shooting.

On cross-examination, when defense counsel asked Joel if the weapon had been pointed at him, he said, "not directly," but it was "near me." When reminded that he had been near the back of the truck at the time, Joel stated the gun "was pointing behind," and even if he was at the back of the truck, "[t]hat's still near me."

On redirect, the prosecutor asked Joel whether he remembered telling an officer at the scene that the gun was pointed over their heads but low enough that someone could have been shot. Joel replied, "Just to scare us. I don't really think he was trying to shoot anybody."

Officer Pescatore, who was 60 feet from the truck at the time, observed "an arm come out of the passenger window, and then saw a muzzle flash and heard a gunshot." He described the arm as "pointing straight out the window" at the group of individuals on the grassy island of the parking lot, about four to five feet away.

Officer McCabe, who was standing by Officer Pescatore, also heard the gunshot, and the two followed the truck - McCabe on foot and Pescatore in his patrol car - as it headed out of the parking area. Pescatore soon stopped the truck and ordered the six occupants out of the truck one at a time. As Petitioner backed toward the officer, he whispered to Roselynn, Camilo, and Julio, "If one of you guys rat on me like I'll make sure when I get out I'll kill you guys. If not, I'll send someone to kill you."

Investigator Steven Rossi testified that he spoke to Joel F. in the parking lot after the incident and then took him to the police station. Joel was not able to identify Petitioner as the shooter, but he told Rossi an hour or so after the shooting that "he just got shot at and he was scared, and that's why he ducked behind the car because he feared for his life, that he was going to get shot." Rossi described Joel as visibly shaken.

1     (Lodged Doc. E at 2-5.)

2   **III.**     **DISCUSSION**

3         **A.**     **Jurisdiction and Standard of Review**

4         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

5 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

6 enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484,

7 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus,

8 it is governed by its provisions.

9         Under AEDPA, an application for a writ of habeas corpus by a person in custody under

10 a judgment of a state court may be granted only for violations of the Constitution or laws of the

11 United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal

12 habeas corpus relief is available for any claim decided on the merits in state court proceedings

13 if the state court's adjudication of the claim:

14
15         (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

16
17         (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

18 28 U.S.C. § 2254(d).

19         1.    Contrary to or an Unreasonable Application of Federal Law

20         A state court decision is "contrary to" federal law if it "applies a rule that contradicts

21 governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

22 materially indistinguishable from" a Supreme Court case, yet reaches a different result."

23 Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA

24 does not require state and federal courts to wait for some nearly identical factual pattern

25 before a legal rule must be applied. . . . The statue recognizes . . . that even a general

26 standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930,

27 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law"

28 requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v.

Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).   A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

## 2.   Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.   Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Harrington, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its

1   decision can be deemed to have been 'adjudicated on the merits.'").

2          Harrington instructs that whether the state court decision is reasoned and explained,

3   or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d)

4   is the same: "Under § 2254(d), a habeas court must determine what arguments or theories

5   supported or, as here, could have supported, the state court's decision; then it must ask

6   whether it is possible fairminded jurists could disagree that those arguments or theories are

7   inconsistent with the holding in a prior decision of this Court." Id. at 786.  Thus, "even a strong

8   case for relief does not mean the state court's contrary conclusion was unreasonable."  Id.

9   (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in

10  cases where there is no possibility fairminded jurists could disagree that the state court's

11  decision conflicts with this Court's precedents."  Id.  To put it yet another way:

12          As a condition for obtaining habeas corpus relief from a federal court, a
        state prisoner must show that the state court's ruling on the claim being
13      presented in federal court was so lacking in justification that there was an error
        well understood and comprehended in existing law beyond any possibility for
14      fairminded disagreement.

15  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the

16  principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It

17  follows from this consideration that § 2254(d) "complements the exhaustion requirement and

18  the doctrine of procedural bar to ensure that state proceedings are the central process, not just

19  a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433

20  U.S. 72, 90 (1977).

21          3.     Prejudicial Impact of Constitutional Error

22          The prejudicial impact of any constitutional error is assessed by asking whether the

23  error had "a substantial and injurious effect or influence in determining the jury's verdict."

24  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22

25  (2007) (holding that the Brecht standard applies whether or not the state court recognized the

26  error and reviewed it for harmlessness).  Some constitutional errors, however, do not require

27  that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310

28  (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas

1    petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v.

2    Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do

3    not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d

4    911, 918, n. 7 (2002);  Musalin v. Lamarque, 555 F.3d at 834.

5    **IV.   REVIEW OF CLAIMS**

6          **A.    Lack of Adequate Notice of Charges**

7          In his first ground for relief Petitioner contends that variance between the theory of

8    attempted murder pled and argued at trial and that articulated in Stone II deprived him of

9    adequate notice of the charges. Petitioner argues that there was no way to determine what

10   theory the jury relied upon for conviction. (Pet. at 8.)

11         Petitioner presented this claim on appeal to the Fifth DCA after its original decision was

12   reversed and remanded California Supreme Court. Upon remand, the claim was denied in a

13   reasoned decision by the Fifth DCA and summarily denied by the California Supreme Court.

14   (See Lodged Docs. E-G.) Because the California Supreme Court's opinion is summary in

15   nature, this Court "looks through" that decision and presumes it adopted the reasoning of the

16   California Court of Appeal, the last state court to have issued a reasoned opinion.  See Ylst

17   v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look

18   through" presumption that higher court agrees with lower court's reasoning where former

19   affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th

20   Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining

21   whether state court's rejection of petitioner's claims was contrary to or an unreasonable

22   application of federal law under 28 U.S.C. § 2254(d)(1)).

23         In denying Petitioner's claim, the Fifth DCA explained:

24   DISCUSSION

25         Appellant was charged with the attempted murder of Joel F., one of the
     people in the crowd he shot at. On appeal, appellant argued that the trial court
26   incorrectly instructed on attempted murder by giving a "kill zone" instruction; that
     the prosecutor misstated the law on that subject during argument, exacerbating
27   the erroneous instruction; and that the evidence was insufficient to support the
     attempted murder conviction. We agreed and reversed, finding prejudicial
28   instructional error and insufficient evidence that appellant specifically intended
     to kill Joel F. The Supreme Court agreed with our conclusions that the kill zone

1
2
3

instruction was given in error and, implicitly, that the evidence did not demonstrate a specific intent to kill Joel F. The court also held, however, that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. (Stone II, supra, 46 Cal.4th at p. 140.) It suggested that this is the theory upon which appellant was tried and that it is what the evidence showed.

4
5
6
7
8

The court remanded the case to us because both of our conclusions--that error in instructing on the kill zone theory, combined with the prosecutor's argument, was prejudicial, and that insufficient evidence supported the attempted murder conviction--may have been based, at least in part, on the understanding that attempted murder required the intent to kill a particular person. (Stone II, supra, 46 Cal.4th at p. 139.) The court acknowledged that, in hindsight, it would have been better had the case been charged differently. (Id. at p. 141.) In its remand, the court stated:

9
10
11
12

"The Court of Appeal should reconsider the issues of this case in light of the views expressed in this opinion. In doing so, the court should consider any issues regarding the variance between the information--alleging [appellant] intended to kill Joel F.--and the proof at trial--[appellant] intended to kill someone although not specifically Joel F. (See … § 956.)" (Stone II, supra, at p. 142.)

13

1. Theory for Attempted Murder Conviction

14
15
16
17
18
19

On remand, appellant argues that the record is inadequate to determine whether the jury found him guilty of attempted murder on a legally supportable theory. As argued by appellant, he was tried on two theories: (1) the specific intent to kill Joel F., which was not supported by sufficient evidence; and (2) the kill zone theory, which was both legally and factually inapposite. Appellant claims he was not tried on a pleading or theory "that he specifically intended to kill one member of a group of persons gathered together in [a] parking lot … on October 21, 2005." "[T]his court cannot," he claims, "determine whether appellant was convicted on this theory, or on one of the other two [unsupported] theories." We disagree.

20
21

First, we disagree with the proposition that appellant was tried on the theory that he specifically intended to kill Joel F. While the information did name Joel F. as the victim of the attempted murder, this theory was not pursued by the prosecutor at trial. In his opening argument, the prosecutor noted that

22
23
24
25
26

"when [appellant] got that gun and went to the carnival, … he wasn't thinking [about] Joel F.[.] … hadn't singled out Joel F.[.] … as an individual. He was looking for a group of that rival gang, a Norteno. [P] … [A]nd he went back with that gun to find one of them …. [P] … [P] When [appellant] is shooting, … he's going to kill somebody within that 'kill zone'. Joel F.[.] was one of them. There were others there as well …. [P] … [P] He didn't specifically go for Joel F[.] He was just one in that 'kill zone' and he intended to kill someone in there …."

27

In his closing argument, the prosecutor pressed the same theme:

28

"There's no evidence [appellant] even knew Joel F[.] by name. He

1    was just one of that group that was in that 'kill zone'. Okay? And
     that's why he fired. He was, Joel F[.] was in that zone and so were
2    others…."

3        Neither would it be reasonable to think that the jury, despite the
     prosecutor's argument, might have reached the conclusion that appellant did
4    specifically intend to kill Joel F. when he fired a shot into the group of which Joel
     was a part. As noted by our Supreme Court in <u>People v. Guiton</u> (1993) 4 Cal.4th
5    1116, appellate courts must

6            "'proceed on the assumption that [juries] reasonably,
             conscientiously, and impartially apply[] the standards that govern
7            the[ir] decision.' (<u>Strickland v. Washington</u> (1984) 466 U.S. 668,
             695.) Thus, if there are two possible grounds for the jury's verdict,
8            one unreasonable and the other reasonable, we will assume,
             absent a contrary indication in the record, that the jury based its
9            verdict on the reasonable ground." (<u>Id</u>. at p. 1127.)

10   We make that assumption here and conclude the jury did not convict based on
     the theory that appellant specifically intended to kill Joel F.
11

12       For similar reasons, we also reject the proposition that the jury convicted
     appellant on the theory embodied in the kill zone paragraph of CALCRIM No.
13   600, even as the instruction was modified here. That theory posits that a
     defendant may be found to have had the intent to kill multiple victims when, in
14   an effort to kill a targeted victim, he or she employs means that create a zone
     of danger to all persons within the zone. (<u>People v. Bland</u> (2002) 28 Cal.4th 313,
15   330.) As explained in <u>Stone II</u>, "[t]hat theory addresses the question of whether
     a defendant charged with the murder or attempted murder of an intended target
16   can also be convicted of attempting to murder other, nontargeted, persons."
     (<u>Stone II</u>, <u>supra</u>, 46 Cal.4th at p. 138.)

17       As we noted in our original opinion in this matter, the kill zone instruction
     contains an ambiguity in that it refers in one sentence to the accused's intent to
18   kill "anyone within the kill zone" and in the next sentence to harming "everyone
     in the kill zone." If a jury instruction is ambiguous, we inquire whether there is a
19   reasonable likelihood that the jury understood and applied the instruction in the
     asserted manner. (<u>People v. Hernandez</u> (2003) 111 Cal.App.4th 582, 589; <u>see</u>
20   <u>also</u> <u>People v. Bland</u>, supra, 28 Cal.4th at p. 333.) One of the ways in which we
     can make that determination is to examine the prosecutor's argument to the jury.
21   (<u>People v. Bland</u>, <u>supra</u>, at p. 333; <u>see also</u> <u>People v. Guiton</u>, supra, 4 Cal.4th
     at p. 1130; <u>People v. Brown</u> (1988) 45 Cal.3d 1247, 1256.) We have already
22   quoted at length from the prosecutor's argument here. We also have reviewed
     the entire record. Suffice it to say that there was never any suggestion to this
23   jury that it should or could convict appellant on the theory that, in an effort to kill
     a targeted victim, he employed a means that created a zone of harm for all
24   persons within it, including the targeted victim. The theory simply did not apply
     to the facts, and it would be unreasonable for us to assume the jury tried to
25   make it fit.

26       Rather, it is clear now and has always been clear that the jury convicted
     appellant on the theory upon which the prosecution relied: that appellant fired
27   a single bullet into a group of people, intending to kill any one of them. The jury's
     verdict clearly demonstrates its finding that appellant did intend to kill when he
28   fired that single shot. The question presented now is whether that finding can be

U.S. District Court
E. D. California

allowed to stand or, instead, must fall because it was attached to the erroneous second step of the prosecutor's theory--that a finding that appellant intended to kill a person, any person, from the group, was sufficient to support a conviction for the attempted murder of Joel F. We agree with the Supreme Court that the answer depends upon principles relating to variance between the pleading and proof; for, it seems clear to us, if the prosecutor could have moved, at the end of trial but before the jury's verdict, to amend the information to substitute "a human being" as the victim, deleting Joel F., then appellant suffers no prejudice should we in effect allow such an amendment now.

We proceed to consider that question.

2. Variance Between Pleading and Proof at Trial

In remanding this case, the Supreme Court found it "problematic" that the information alleged that appellant intended to kill an identified victim, Joel F., but the prosecution "ultimately could not prove that [appellant] targeted a specific person rather than simply someone within the group." (Stone II, supra, 46 Cal.4th at p. 141.) The court ordered us to consider any issues arising from the variance between the allegation of the information that appellant intended to kill Joel F. and the proof at trial that he "intended to kill someone although not specifically Joel F. (See … § 956.)" (Id. at p. 142.)

Appellant now contends that to ignore the variance between the pleading and proof, by allowing his conviction on count 1 to stand, would in effect deprive him of constitutionally adequate notice of the charges and the opportunity to prepare his defense. Specifically, appellant contends that, based on the information, he was called upon only to defend against a charge that he attempted to kill Joel F., and the expansion of the possible victims to include anyone within the targeted group was a material variance and, therefore, prejudicial. We disagree.

The due process guarantees of the state and federal Constitutions require that a criminal defendant "receive notice of the charges adequate to give a meaningful opportunity to defend against them." (People v. Seaton (2001) 26 Cal.4th 598, 640.) "No accusatory pleading is insufficient, [however,] nor can the trial, judgment or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits." (§ 960.) Section 956, cited to us in the Supreme Court's remand order, is as follows:

> "When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, *an erroneous allegation as to the person injured*, or intended to be injured, or of the place where the offense was committed, or of the property involved in its commission, is not material." (Italics added.)

If the information charges the offense in such manner that the defendant is apprised of the act with which he or she is charged with sufficient certainty to enable the defendant to make a defense thereto, if the defendant is not misled by any statement contained in the information, and the transaction is so identified that the defendant, by a proper plea, may protect himself or herself against another prosecution for the same offense, it must be held that the allegations are sufficient to sustain the conviction when an attack is made upon

the ground of variance. (<u>People v. Silverman</u> (1939) 33 Cal.App.2d 1, 4-5.)

In order to obtain reversal of a conviction on the ground there was a variance between the allegations of an information and the proof at trial, the variance must be "material." (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 191, p. 398.)

"[A]n information plays a limited but important role: it tells a defendant what kinds of offenses he is charged with (usually by reference to a statute violated), and it states the number of offenses (convictions) that can result from the prosecution. But the time, place and circumstances of charged offenses are left to the preliminary hearing transcript; it is the touchstone of due process notice to a defendant." (<u>People v. Gordon</u> (1985) 165 Cal.App.3d 839, 870 (conc. opn. of Sims, J.), disapproved on other grounds in <u>People v. Frazer</u> (1999) 21 Cal.4th 737, 765, overruled on another ground in <u>Stogner v. California</u> (2003) 539 U.S. 607, 610, 632-633.)

"The test of the materiality of a variance [between the accusatory pleading and the proof] is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same offense." (<u>People v. LaMarr</u> (1942) 20 Cal.2d 705, 711.)

For instance, it has been held that, provided the information correctly alleges the county in which the offense occurred, a mistake in the address of the site of a burglary is an immaterial variance that does not require reversal of a conviction. (<u>People v. Williams</u> (1945) 27 Cal.2d 220, 226.) And it has frequently been held that convictions may be affirmed notwithstanding that the information stated erroneous names as owners of stolen property. (<u>People v. Larrabee</u> (1931) 113 Cal.App. 745, 747; <u>People v. Cloud</u> (1929) 100 Cal.App. 792, 794; <u>People v. Nunley</u> (1904) 142 Cal. 105, 107-109; <u>People v. Leong Quong</u> (1882) 60 Cal. 107, 108.)

In <u>People v. Powell</u> (1974) 40 Cal.App.3d 107, the information charged the defendants with murdering a Los Angeles police officer in Los Angeles County. But the evidence at trial showed that the defendants kidnapped the officer in Los Angeles and drove him to Kern County, where they murdered him. (<u>Id.</u> at pp. 116-118.) The appellate court rejected the defendants' claim that the variance between the evidence and the information prejudiced them. The court found the claim "specious," noting that the defendants had previously been tried for the same offense and had the benefit of a preliminary hearing transcript and a full trial transcript. "In no way could they or their counsel have been misled as to the nature of the evidence that the prosecution would offer." (<u>Id.</u> at pp. 123-124.)

And in <u>In re Michael D.</u> (2002) 100 Cal.App.4th 115, a minor pointed a replica firearm at a student at an elementary school playground. An office manager saw the minor threatening the student and alerted staff and the police. (<u>Id.</u> at pp. 119-120.) The petition alleged the minor violated section 417.4 by brandishing a replica firearm, causing the office manager, not the student, to be in fear. Although the minor raised the issue as one of insufficiency of the evidence, the court addressed it as a variance between the petition and the proof and found it to be inconsequential. (<u>In re Michael D.</u>, at p. 128.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, the time, place, and circumstances of the charged offense appear in the transcript of the preliminary hearing. At that hearing, Officer Pescatore testified that, after observing some gang members congregating at a street carnival parking lot, he observed a truck drive towards the group of Nortenos, slow down, "and at that time I saw an arm come out the [passenger side] window and I heard and saw a gunshot." When asked where the weapon was being pointed, Pescatore said, "To me it appeared the weapon was being pointed at the group of Nortenos." He estimated the truck was four feet from the Norteno group at that point. The truck was subsequently stopped and appellant was in the front right passenger-side seat.

Investigator Rossi testified at the preliminary hearing that he spoke with "some of the victims or the Nortenos that were shot at," specifically "one of those individuals Joel F[.]." Joel F. denied being a gang member but acknowledged some of the people he was with were Nortenos. Joel F. told Investigator Rossi that the group in the truck and the people in his group were "mad-dogging" each other and someone in the truck shouted "X3" and "threw up three fingers," both gang identifications. The truck then drove by the group slowly and the right front passenger held out a handgun in the direction of the group "aimed slightly over their heads" but low enough that somebody in the group could have been shot. Joel F. feared for his safety and hid behind a parked car.

Investigator Rossi also testified that he spoke to Jamal, who told him he saw the right front passenger raise his right hand and point a gun out the window in the direction of the group. Jamal hid behind a car and then heard a shot.

At the conclusion of the preliminary hearing, counsel for appellant asked to address the court on the issue of the attempted murder:

"It's a very serious charge and I think it's going to take more than just an individual saying, and I quote, 'He pointed the gun in our direction, he thought it was a little bit high but it may have been--it could have possibly shot someone in our group.' [P] I think that's an assault with a deadly weapon, I do not think that's specific intent to commit murder on an individual."

The prosecutor argued defense counsel's concern was an issue for trial.

Thus, the information notified appellant that he was charged with a single count of attempted murder. The testimony at the preliminary hearing described "with sufficient certainty" that the offense was committed on October 21, 2005, while appellant was seated in a pickup truck and fired a single shot from a handgun at a group of Nortenos together in a grassy area of the parking lot. After this, the evidence at trial presented no surprises.

At least as far as we are aware, appellant registered no objection, at trial or otherwise, to the prosecutor's theory of guilt. That is, defense counsel gave no indication that he was taken by surprise by that theory of guilt. Defense counsel simply attempted to work around that theory. Appellant presented no defense that depended upon the identity of Joel F. as the intended victim. Appellant's defense was that he was not the shooter, and that, if he was, he aimed above the heads of the entire group and was not "trying to shoot anybody." Defense counsel specifically stated that the prosecution had failed to prove not only that appellant intended to kill Joel F. but also that appellant intended to kill anyone. "[I]f he intended to kill Joel [F.], according to Joel [F.]'s

1

2

statement, if he intended to kill anybody, if he intended to shoot anybody he would have. Didn't happen. It didn't happen."

3

The issue in appellant's trial was not who he intended to kill but whether he intended to kill. We perceive no possibility of prejudice to appellant in the identification of the victim as Joel F. and conclude that any error was harmless.

4

(See Lodged Doc. E at 5-14.)

5

1.   Legal Standard

6

7

"The Sixth Amendment guarantees a criminal defendant the fundamental right to be

8

informed of the nature and cause of the charges made against him so as to permit adequate

9

preparation of a defense." Gautt v. Lewis, 489 F.3d 993, 1002 (9th Cir. 2007); see also U.S.

10

CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be

11

informed of the nature and cause of the accusation . . . ."); Cole v. Arkansas, 333 U.S. 196,

12

201 (1948) ("It is as much a violation of due process to send an accused to prison following

13

conviction of a charge on which he was never tried as it would be to convict him upon a charge

14

that was never made."). "No principle of procedural due process is more clearly established

15

than that notice of the specific charge, and a chance to be heard in a trial of the issues raised

16

by that charge, if desired, are among the constitutional rights of every accused in a criminal

17

proceeding in all courts, state or federal." Cole, 333 U.S. at 201. To satisfy the Sixth

18

Amendment, "an information [must] state the elements of an offense charged with sufficient

19

clarity to apprise a defendant of what he must be prepared to defend against." Gautt, 489 F.3d

20

at 1003 (citation omitted); James v. Borg, 24 F.3d 20, 25 (9th Cir. 1994) ("An information is not

21

constitutionally defective if it states the elements of an offense charged with sufficient clarity

22

to apprise a defendant of what to defend against.") (internal quotation marks and citations

23

omitted).

24

Even assuming the prosecution's charges amounted to a variance of proof, "[t]he true

25

inquiry, . . . is not whether there has been a variance in proof, but whether there has been

26

such a variance as to affect the substantial rights of the accused." Berger v. United States,

27

295 U.S. 78, 82, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) (internal quotation marks omitted).

28

Making that determination brings the Court back to the "obvious requirements" that the

defendant must be informed of the charges so as to avoid surprise, be able to present a

1    defense, and be protected against another prosecution for the same offense. Id.

2         To determine whether a defendant has received fair notice of the charges, "the court

3    looks first to the information." James, 24 F.3d at 24. Thus, as a threshold matter, the Court first

4    considers the constitutional adequacy of the information.

5              2.    Analysis

6         Here, as explained in detail by the state courts, the information clearly stated that

7    Petitioner was charged with the attempted murder of Joel F., rather than the attempted murder

8    of any individual in the crowd of people that Joel F. was with. The California Court of Appeals

9    found that the jury convicted Petitioner of attempted murder of any individual in the crowd,

10   rather than just Joel F., and proceeded to address the issue of variance:

11             The question presented now is whether that finding can be allowed to
               stand or, instead, must fall because it was attached to the erroneous second
12             step of the prosecutor's theory--that a finding that appellant intended to kill a
               person, any person, from the group, was sufficient to support a conviction for the
13             attempted murder of Joel F.

14   (Lodged Doc. E at 8-9.) Upon review of the information and testimony and evidence presented

15   at the preliminary hearing, the state court held that Petitioner was clearly informed that he was

16   being charged with attempted murder for the act of firing a shot at the crowd of people. (Id. at

17   13.) The evidence at the preliminary hearing described in detail that Petitioner, while seated

18   in a pickup truck, shot at a group of Nortenos in the parking lot on the date in question. (Id.)

19   The state court held that the error in the charging document was harmless because Petitioner

20   presented no defense that depended on the identity of Joel F. as the intended victim. Instead,

21   Petitioner argued that he shot above the heads of everyone in the group, and did not have the

22   intent to kill anyone. (Id. at 13-14.) ("The issue in appellant's trial was not who he intended to

23   kill but whether he intended to kill. We perceive no possibility of prejudice to appellant in the

24   identification of the victim as Joel F. and conclude that any error was harmless.")

25        In this case, the state appellate court decision was not unreasonable. The

26   determination that the variance between the charging document and theory of the crime was

27   harmless because Petitioner's defense focused solely on his lack of intent to kill anyone was

28   a reasonable determination by the state court.

1   Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

2   decision that was contrary to, or involved an unreasonable application of, clearly established

3   Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

4   The claim should be denied.

5       **B.    Double Jeopardy**

6       The Fifth Amendment to the United States Constitution guarantees that no person shall

7   "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend

8   V. The Double Jeopardy Clause protects against three distinct abuses: a second prosecution

9   for the same offense after conviction, a second prosecution for the same offense after

10  acquittal, and multiple punishments for the same offense. Schiro v. Farley, 510 U.S. 222, 229

11  (1994).

12      The Supreme Court has made clear that the "general prohibition against successive

13  prosecutions does not prevent the government from retrying a defendant who succeeds in

14  getting his first conviction set aside . . . because of some error in the proceedings leading to

15  conviction." Lockhart v. Nelson, 488 U.S. 33, 38 (1988). The Supreme Court has recognized

16  an exception to this general rule "when a defendant's conviction is reversed by an appellate

17  court on the sole ground that the evidence was insufficient to sustain the jury's verdict." Id. at

18  39 (citing Burks v. United States, 437 U.S. 1, 18 (1978)). In Montana v. Hall, 481 U.S. 400, 404

19  (1987), the Supreme Court made clear "that the Constitution permits retrial after a conviction

20  is reversed because of a defect in the charging document."

21      Petitioner argues here, as he did on direct appeal, that the "variance between the

22  pleading, proof, and the unspecified victim theory of attempted murder dictates that retrial is

23  double jeopardy barred." (Pet. at 11.) Upon direct review, the Fifth DCA found that there was

24  insufficient evidence to convict Petitioner of attempted murder of Joel F. However, the

25  California Supreme Court reversed and remanded the matter, finding that the Fifth DCA erred

26  in finding that Petitioner could not be convicted of attempted of any individuals in the crowd.

27  Upon remand, the Fifth DCA found that "it is clear now and has always been clear that the jury

28  convicted appellant on the theory upon which the prosecution relied: that appellant fired a

1   single bullet into a group of people, intending to kill any one of them. The jury's verdict clearly

2   demonstrates its finding that appellant did intend to kill when he fired that single shot." (Lodged

3   Doc. E at 8.) Petitioner was only tried once, and the finding that there was insufficient evidence

4   to support the conviction was reversed by the California Supreme Court. Accordingly,

5   Petitioner was not retried nor the conviction vacated based on insufficient evidence.

6       Because Petitioner's original convictions were not reversed on the grounds that the

7   evidence was insufficient to support the jury's verdict nor was Petitioner retried, the state

8   courts properly rejected Petitioner's double jeopardy claim. Petitioner identifies no clearly

9   established federal law which mandates  a different result. Accordingly, Petitioner's double

10  jeopardy claim should be denied. Petitioner is not entitled to habeas corpus relief and it is

11  recommended that his petition be dismissed.

12  **V.      FINDINGS AND RECOMMENDATIONS**

13      Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be

14  DENIED with prejudice. It is further recommended that the Clerk of Court be directed to enter

15  judgment.

16      This Findings and Recommendation is submitted to the assigned District Judge,

17  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being

18  served with the Findings and Recommendation, any party may file written objections with the

19  Court and serve a copy on all parties.  Such a document should be captioned "Objections to

20  Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be

21  served and filed within fourteen (14) days after service of the objections. The parties are

22  advised that failure to file objections within the specified time may waive the right to appeal the

23  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24

25

26  IT IS SO ORDERED.

27  Dated:    May 24, 2013            /s/  *Michael J. Seng*
                                    UNITED STATES MAGISTRATE JUDGE

28